## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTINE A. CAMPBELL, | ) | CASE NO.      5:14CV526 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| | ) | MAGISTRATE JUDGE GREG WHITE |
| CAROLYN W. COLVIN, | ) | |
|    Acting Commissioner of Social | ) | |
|    Security | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

Plaintiff Christine A. Campbell ("Campbell") challenges the final decision of the Acting Commissioner of Social Security, Carolyn W. Colvin ("Commissioner"), denying her claim for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq.*  This matter is before the Court pursuant to 42 U.S.C. § 405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be AFFIRMED.

### I.  Procedural History

On May 25, 2010, Campbell filed applications for POD, DIB, and SSI alleging a disability onset date of November 20, 2007 and claiming she was disabled due to lupus.  (Tr. 126, 139,  234, 241.)  Her application was denied both initially and upon reconsideration.  (Tr. 186-189, 190-192, 197-199, 201- 203.)

On August 9, 2012, an Administrative Law Judge ("ALJ") held a hearing during which

Campbell, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 51-113.)  On October 12, 2012, the ALJ found Campbell was able to perform a significant number of jobs in the national economy and, therefore, was not disabled.  (Tr. 23-38.)  The ALJ's decision became final when the Appeals Council denied further review.  (Tr. 4-6.)

## II.  Evidence

### Personal and Vocational Evidence

Age fifty-three (53) at the time of her administrative hearing, Campbell is a "person closely approaching advanced age" under social security regulations.  *See* 20 C.F.R. § 404.1563 & 416.963(d).  She has a high school education and past relevant work as a property manager. (Tr. 36, 55, 99.)

### Medical Evidence

Campbell has a long history of multiple physical and mental impairments.  On November 20, 2007, Campbell presented to the emergency room with complaints of pain and swelling in the right side of her neck.  (Tr. 353-356.)  A CT scan showed inflammatory changes in the right submandibular region consistent with acute sinusitis.  (Tr. 361.)  Campbell was admitted; diagnosed with bacteremia streptococcus group G; and, treated with antibiotics, steroids, and pain medication.[1]  (Tr. 353-354.)  She underwent removal of nonrestorable teeth and an abscess, and was discharged on November 29, 2007.  (Tr. 353-354.)

On December 19, 2007, Campbell presented to Allen M. Kline, D.O., with complaints that her neck was still painful and swollen.  (Tr. 391-392.)  Dr. Kline diagnosed neck abscess; strep bacteremia; poor dentition; and, asthma; and referred her for another CT scan.  *Id.*  This CT scan was performed on December 26, 2007, and showed significant improvement in inflammation.  (Tr. 324.)

In January 2008, Campbell underwent a CT scan of her abdomen and pelvis.  (Tr. 330.) It showed a large mid-abdominal, likely umbilical hernia; left ovarian mass probably cystic; and,

---

[1] Campbell's hospital records also note that she suffered from hypogammaglobulinemia. This is an immune deficiency condition marked by "abnormally low levels of all classes of immunoglobulins in the blood." Dorland's Illustrated Medical Dictionary (30th Ed. 2003).

2

a probable right ovarian functional cyst.  *Id.*  On January 28, 2008, Campbell underwent surgical repair of her large incarcerated umbilical hernia with mesh.  (Tr. 327-328.)  The following month, she had several nonrestorable teeth surgically removed.  (Tr. 329.)

In February 2008, Campbell returned to Dr. Kline with complaints of chest pain; shortness of breath; chronic low back pain; headaches; and, diarrhea.  (Tr. 389-390.)  She also reported increased anxiety; shaking; crying spells; low energy; and, low motivation.  *Id.*  Dr. Kline diagnosed status post hernia repair; post-traumatic stress disorder/anxiety; alopecia;[2] and, hypertension.  (Tr. 390.)  He prescribed Valium and Maclizine.  *Id.*

Campbell presented to Dr. Kline again in May 2008.  (Tr. 387-388.)  She reported headaches; occasional dizziness; chest pain; shortness of breath; edema; and, diarrhea.  (Tr. 387.)  In addition, she complained of increased anxiety; increased agitation; shakiness; and, claustrophobia.  *Id.*  Dr. Kline noted that Campbell's medications included Singulair; Protonix; MaxAir; Inderal; Reglan; Imitrex; Bentyl; and, Antivert.  *Id.*  He diagnosed sinusitis and anxiety disorder, and prescribed Zoloft and Avelox.  (Tr. 388.)  Campbell returned to Dr. Kline in September 2008 with complaints of high blood pressure; shortness of breath; and, edema.  (Tr. 385.)  It was noted that her weight was 289 pounds.  *Id.*  Dr. Kline decreased her Zoloft dosage, but otherwise continued her medications.  (Tr. 385-386.)

The next treatment note in the medical record is from June 2010.  At that time, Campbell presented to Dr. Kline with complaints of headaches; shortness of breath; edema; and, poor sleep.  (Tr. 383-384.)  Dr. Kline's treatment notes reflect that Campbell's husband had recently passed away, and she was seeing a counselor.  (Tr. 384.)  At this time, Dr. Kline completed a questionnaire regarding Campbell's condition.  (Tr. 395-396.)  Therein, he described her symptoms as daily headaches; hair loss; leg pain; insomnia; dizziness; swelling; and, gastroesophageal reflux disease ("GERD").  (Tr. 395.)  He diagnosed severe depression; hypertension; migraines; and, rule out lupus.  *Id.*  In response to a question regarding Campbell's

---

[2] Alopecia is the "lack or loss of the hair from skin areas where it normally is present." Dorland's Illustrated Medical Dictionary (30th Ed. 2003).

3

functional limitations, Dr. Kline wrote "[Secondary to] migraines/generalized pain/ fatigue/ depression; pt is reclusive/tired all the time; has constant pain [in] muscles; insomnia; very depressed; poor sleep; poor concentration; no enjoyment in life." (Tr. 396.)

Campbell returned to Dr. Kline in September 2010. (Tr. 381-382.) She reported headaches; dizziness; chest pain; edema; GERD; and, difficulty sleeping. (Tr. 381.) On examination, Campbell was positive for heart murmur. *Id.* Her weight was noted as 262 pounds. *Id.* Dr. Kline recommended Campbell exercise and improve her diet. (Tr. 382.) He ordered blood work to rule out lupus; and, diagnosed migraines and depression. *Id.*

In October 2010, Jeff Rindsberg, Psy. D., performed a consultative mental examination. (Tr. 397-400.) Campbell reported feeling "a lot sadder" since her husband passed away in May 2010. (Tr. 398.) She stated she had been experiencing anxiety regarding her various medical conditions, and reported having "panic attacks on occasion." *Id.* Dr. Rindsberg diagnosed adjustment disorder with anxiety; and, assigned a Global Assessment of Functioning of 70.[3] (Tr. 400.) He concluded that Campbell's (1) ability to understand and follow instruction was not impaired; (2) ability to maintain attention and perform simple, repetitive tasks was mildly impaired; (3) ability to relate to others, including fellow workers and supervisors, was not impaired; and, (4) ability to withstand the stress and pressures associated with day to day work activities was mildly impaired. *Id.*

------------------------

[3] The GAF scale reports a clinician's assessment of an individual's overall level of functioning. *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (American Psychiatric Association, 4th ed revised, 2000) ("DSM-IV"). An individual's GAF is rated between 0 - 100, with lower numbers indicating more severe mental impairments. A GAF score between 51 - 60 denotes "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." DSM-IV at 34. A GAF score between 61 -70 indicates "some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household) but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* It bears noting that a recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Association, 5th ed., 2013).

The following month, state agency physician Steven Meyer, Ph.D., completed a mental Residual Functional Capacity ("RFC") Assessment.  (Tr. 135-136.)  He found Campbell moderately limited in her abilities to (1) carry out detailed instruction; (2) maintain attention and concentration for extended periods; (3) interact appropriately with the general public; and, (4) get along with coworkers or peers without distracting them or exhibiting behavioral extremes. *Id.*  Dr. Meyer explained that "Claimant is limited to simple and some moderately complex routine tasks, at reasonable pace, in setting with regular expectations; and intermittent/occasional interactions with others."  (Tr. 136.)

In December 2010, Wilfredo Paras, M.D., performed a consultative physical examination.  (Tr. 402-408.)  He noted a history of migraines; spastic colon; stomach ulcer; GERD; vertigo; asthma; obesity; and, joint pain.  (Tr. 402-403.)  With regard to her migraines, Dr. Paras stated as follows:

> The claimant has been having migraines for several years, which was diagnosed by her primary care physician.  She was admitted to the hospital once for treatment of her migraine headaches and discharged after many hours after being given an injection for her migraine headache.  She also underwent several tests at that time.  She experiences headaches about once a month at present with the intake of Imitrex.  She described her headaches as excruciating pain in her head, which is affected by bright lights and certain smells like raspberry.  Her headaches can last for about 30-45 minutes with the intake of Imitrex.  She stated she prefers to stay in a dark room whenever she has a headache.  Her headaches are associated with nausea and vomiting at times.  Her last episode of migraine headache occurred about one week ago.

(Tr. 402.)  On examination, Dr. Paras observed no shortness of breath or wheezing.  (Tr. 403.)  He reported Campbell walked normally without an assistive device.  *Id.*  He noted regular heart rate but stated "there was a systolic ejection murmur on both the right and left sternal border, non-radiating."  *Id.*  Dr. Paras found no edema or varicosities, but observed that "distal pulses in both legs were reduced to about 2+" and "the deep tendon reflexes were reduced bilaterally."  *Id.* He found no evidence of joint abnormalities, and examination of both knees revealed no crepitus, swelling, or tenderness.  *Id.*  Manual muscle testing and range of motion examination were "essentially unremarkable." *Id.*

Dr. Paras diagnosed migraine headaches; spastic colon; history of stomach ulcer; GERD;

5

"apparently objective vertigo;" bronchial asthma; moderate obesity; and, hyperhidrosis.[4]  (Tr. 403-404.)  He concluded that "this claimant's ability to perform work-related physical and mental activities is mainly limited by her migraine headaches, which are aggravated by bright lights."  (Tr. 404.)  He found Campbell's "general work limitation is light work."  *Id.*

State agency physician James Gahman, M.D., completed a physical RFC assessment in January 2011.  (Tr. 133-135.)  He found Campbell was capable of lifting and/or carrying 20 pounds occasionally and 10 pounds frequently; standing and/or walking for six hours in an eight hour workday; sitting for six hours in an eight hour workday; and, occasionally climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling.  (Tr. 133-134.)  Dr. Gahman concluded Campbell had unlimited push/pull capacity, but could never climb ladders, ropes, or scaffolds.  *Id.*  Finally, he found Campbell should avoid concentrated exposure to fumes, odors, gases, dusts, poor ventilation, and hazards (machinery, heights, etc.)  *Id.*

In April 2011, Dr. Kline completed another questionnaire regarding Campbell's condition, which was identical to his previous opinion from June 2010.  (Tr. 410-412.)  Thereafter, in May 2011, state agency physician Nick Albert, M.D., completed a physical RFC assessment documenting the same limitations as set forth previously by Dr. Gahman.  (Tr. 164-165.)

In May 2011, Campbell began treatment with Maria Galang, M.D.  (Tr. 423-425.)  Campbell reported dizziness as a result of chronic vertigo; chest pain; chronic dyspnea on exertion; and, chronic muscle aches.  (Tr. 423.)  Dr. Galang diagnosed hypertension, and prescribed Atenolol.  (Tr. 425.)  The following month, Campbell presented to Ramakrishna Bandi, M.D., for a gastro-intestinal evaluation.  (Tr. 434.)  Dr. Bandi diagnosed iron deficiency anemia, and ordered both a colonoscopy and esophagogastroduodenoscopy ("EGD").  *Id.*  Both the colonoscopy and EGD were performed on August 16, 2011.  (Tr. 439-442.)  The

---

[4]Hyperhidrosis is defined as excessive perspiration.  *See* Dorland's Illustrated Medical Dictionary (30th Ed. 2003).

colonoscopy was normal; however, the EGD showed a stomach ulcer and duodenitis.[5]  *Id.*  After a biopsy was conducted, Campbell was diagnosed with chronic inactive gastritis.  (Tr. 437.)

On June 23, 2011, Gary Sipps, Ph.D., conducted a consultative mental examination.  (Tr. 427-431.)  Campbell reported daily crying spells and a low energy level.  (Tr. 429.)  She denied suicidal ideation, but stated "she does have times of morbid thoughts such as not wanting to be alive."  *Id*.  Dr. Sipps found Campbell presented with "overt signs of anxiety during the interview."  *Id.*  He reported Campbell "did not indicate a psychological basis for her disability but emphasized medical/physical problems."  (Tr. 430.)  Thus, he concluded that "her statements over the course of the interview did not indicate current severe impairment in her psychological functioning and she commented that things had improved in regards to her crying spells and anxiety leaving her household."  *Id.*

Dr. Sipps diagnosed adjustment disorder with anxiety and depressed mood, chronic in partial remission with treatment; and, assessed a GAF of 60.  *Id.*  He concluded Campbell had "some degree of limitation" in maintaining attention, concentration, persistence and pace, "especially with multistep tasks and much less so with simple tasks."  (Tr. 431.)  In addition, Dr. Sipps found Campbell "would appear to be to some degree limited in her interaction with others given the effects of the adjustment disorder; [h]owever, she would not appear to be impaired in her ability to receive supervision *per se."  Id*.  Finally, he opined that Campbell "would appear to be limited in her ability to manage typical and expected work stressors. . .. [h]owever, [if] she continues with psychological and psychiatric treatment, she likely would become better able in such circumstances without adverse effects."  *Id.*

On July 19, 2011, state agency physician Patricia Semmelman, Ph.D., completed a Mental RFC Assessment.  (Tr. 166-167.)  She concluded Campbell was moderately limited in

---

[5]  Specifically, the EGD showed: "Stomach has about a 0.5cm ulcer in the antrum in the pre-pyloric area along the lesser curvature.  There is exudate in the center without any evidence of recent bleeding or stigmata of bleeding.  Biopsies were obtained from the ulcer margins. Duodenal bulb is normal. Distal to the bulb and second portion of the duodenum, there is inflammation with ring-like narrowing present. The scope went through this area with some resistance.  Otherwise, the second portion of the duodenum is normal." (Tr. 441.)

her abilities to carry out detailed instruction; maintain attention and concentration for extended periods; and, interact appropriately with the general public. *Id*. Dr. Semmelman explained that Campbell "could sustain concentration and attention for routine tasks which are less detailed and complex," but would be precluded from jobs requiring fast pace or exceptionally high production standards. (Tr. 167.) She also opined that Campbell "would be limited to occasional superficial interactions with others." *Id*. Finally, Dr. Semmelman's review of the record led her to conclude that Campbell had "shown improvement" over the past six months and that "the improvement may be due to the lessening of her bereavement" over the death of her husband. *Id.*

In November 2011, Campbell returned to Dr. Galang for follow-up regarding her hypertension and dizziness. (Tr. 490-493.) Dr. Galang added a third blood pressure medication and stated "will investigate for secondary causes of" hypertension. (Tr. 492.) She referred Cambpell to Ben Graef, D.O., for polysomnography. *Id*. In addition, Dr. Galang noted that "on her way out, pt became tearful and admitted that she is undergoing a lot of stress right now . . . [and] is still feeling depressed about her husband's passing a year ago." *Id*. Campbell requested valium "for her nerves," but Dr. Galang declined and advised her to consult her psychiatrist. *Id*. Dr. Galang also stated that "I do think that some of [Campbell's] somatic complaints are psychological and [are] due to the stress she is having right now." *Id.*

On January 19, 2012, Campbell presented to Dr. Graef for a sleep evaluation. (Tr. 468-469.) At this time, she reported chest problems, palpitations, high blood pressure, aches and pains, backaches, swelling in legs, headaches, migraines, dizziness, balance problems, weakness, night sweats, easy bruising, anemia, depression, and anxiety. *Id*. Dr. Graef noted that Campbell reported chronic insomnia "for her entire life since as a child;" however, he found "the more pressing issue is that I do think she has developed sleep apnea on top of the insomnia." (Tr. 469.) He also noted some concern that Campbell may have restless leg syndrome. *Id*. Dr. Graef ordered a polysomnogram to evaluate Campbell's sleep and breathing and cautioned her to be "extremely careful if feeling sleepy," including "caution with driving, operating machinery or other potentially dangerous activities." *Id*. He also found it notable that Campbell reported

8

drinking two to eight cups of coffee per day, along with an occasional cup of tea.  (Tr. 468.)

Campbell underwent a diagnostic polysomnogram on January 25, 2012.  (Tr. 447-448.)
It demonstrated "no significant obstructive sleep apnea," but did note snoring and periodic limb
movements of sleep.  (Tr. 448.)  Campbell returned to Dr. Graef shortly thereafter on February
2, 2012.  (Tr. 464.)  He noted that "overall study showed an absence of sleep apnea," but that
Campbell "does continue to have [Restless Leg Syndrome]."  *Id.*  He ordered blood work and
recommended she lose weight.  *Id.*

Meanwhile, Campbell returned to Dr. Galang on January 25, 2012, complaining of
dizziness, headache, and substernal chest pain.  (Tr. 486.)  Dr. Galang ordered a stress test,
which Campbell underwent on January 31, 2012.  (Tr. 488, 457-459)  The electrocardiographic
portion of the stress test was "positive for ischemia by electrocardiographic criteria" due to chest
pain and "profound dyspnea on exertion after about 2 minutes on the treadmill with a
hypertensive responsive to exercise."  (Tr. 459.)  Subsequent myocardial perfusion imaging,
however, showed no evidence of ischemia and a "normal visual estimate of the left ventricular
ejection fraction."  (Tr. 457.)

Campbell presented to Roger Chaffee, M.D., on February 7, 2012 for evaluation of her
chest pain.  (Tr. 452-453.)  Campbell complained of chronic chest pain which she described as "a
hurt or as someone sitting on her chest."  (Tr. 452.)  She claimed to have mild episodes of chest
pain once or twice a day, and severe episodes once or twice per week.  *Id.*  Campbell stated these
episodes are associated with dyspnea and nausea, and generally resolve with sitting down and
resting.  *Id.*  Dr. Chaffee noted a New York Heart Association ("NYHA") Classification of III,
which denotes a marked limitation in ordinary physical activity.[6]  (Tr. 453.)  He assessed that

---

[6] According to the American Heart Association, "[d]octors usually classify patients' heart
failure according to the severity of their symptoms," with the most commonly used classification
system being the NYHA Functional Classification.  Under this system, Classification III is
described as: "Patients with cardiac disease resulting in marked limitation of physical activity.
They are comfortable at rest.  Less than ordinary activity causes fatigue, palpitation, dyspnea, or
anginal pain."  *See* http://www.heart.org.

Campbell's pain "could be angina" and concluded she "is on the appropriate cardioprotective therapy with a beta-blocker, statin." *Id.* Dr. Chaffee did not order any further testing but did put Campbell on sublingual nitrates and advised her to begin an exercise program. *Id.* In addition, he noted that, if Campbell continued to have "fairly frequent episodes of chest pain," he would consider ordering a cardiac catheterization. *Id.*

On April 20, 2012, Campbell returned to Dr. Galang, with complaints of right knee pain; occasional chest pain; and, edema. (Tr. 588-592.) Dr. Galang diagnosed bursitis of the knee; prescribed naprosyn; and, ordered blood work. (Tr. 591.) Several weeks later, Campbell presented to Anthony Baraga, M.D., for follow-up regarding her right knee pain. (Tr. 594-598.) On examination, Dr. Baraga noted "varus and valgus stress on right knee negative, patellar grind negative, no major crepitus, no erythema or swelling of joint, redundant tissue around knee limits exam; normal [range of motion]." (Tr. 596.) He prescribed Capsaicin topical cream and ordered an x-ray of Campbell's right knee. *Id.* The x-ray report itself is not in the medical record, but a subsequent treatment note states that it showed tricompartmental osteoarthritis. (Tr. 598.)

On May 14, 2012, Campbell returned to Dr. Chaffee for follow-up regarding her hypertension, shortness of breath, and chest pain. (Tr. 566-568.) While Campbell reported some improvement, Dr. Chaffee noted that "she has had what clearly sounds like two episodes of angina at rest since the February visit." (Tr. 566.) Campbell also indicated that she continued to struggle with asthma and reported "daily exertional dyspnea with activities of daily living." (Tr. 566-567.) Dr. Chaffee concluded that Campbell "has fairly stable angina with multiple risk factors," and stated that she "may have balanced three-vessel coronary artery disease." (Tr. 567.) He ordered an elective cardiac catheterization.[7] *Id.*

Finally, the Court notes that, between May 2011 and May 2012, Campbell attended regular therapy sessions at Portage Path. (Tr. 499-564; 570-587.) Treatment notes from these

---

[7] Campbell does not direct the Court's attention to any medical records documenting that she underwent this procedure and, if so, the results.

sessions discuss Campbell's efforts to address her depression, anxiety, and panic attacks.  *Id.*

### *Hearing Testimony*

During the August 9, 2012 hearing, Campbell testified to the following:

- She has a high school education.  She worked as a property manager for fourteen years.  In this job, she ran the office; rented apartments; and, hired and supervised contractors.  She also did some landscaping work herself to beautify the property.  She was on her feet for half of the day, and seated for the other half.  She lifted approximately 30 to 40 pounds.  After that job, she worked for approximately one year as an assistant property manager, where she performed similar work.  She has not worked since her onset date, November 20, 2007.  (Tr. 54-59.)

- Her husband passed away in May 2010 and she now lives alone in an apartment.  She has never had a driver's license.  She is 5' 5" and weighs 250 pounds.  (Tr. 60, 64, 67, 69.)

- In November 2007, she was hospitalized for over a week for treatment of an infection.  She continued to have side effects after her hospitalization, and her doctor advised her not to work.  She has not had any inpatient hospitalizations since November 2007.  (Tr. 55, 69.)

- Her most significant problem is depression.  Her depression "takes all her energy and strength" and effects her concentration.  She cries daily and has difficulty focusing, particularly when she is reading.  She sees a registered nurse and counselor for this condition, and has been prescribed Lexapro, Viibryd, and Trazodone.  She has never presented to the emergency room or been hospitalized for psychiatric reasons.  Her depression worsened when her husband passed away.  She tries to smile and act happy, but she "just wants to cry."  She does not want to be alive, but has no suicidal intentions because of her faith.  She takes her medication and is trying to get better.  She also experiences panic attacks, where her heart races and "thinking is impossible."  (Tr. 73-77, 91-92, 97.)

- She is also unable to work due to her chest pain.  She believes she experienced a heart attack in June or July 2012.  She felt pain in her chest and took aspirin and nitroglycerin.  She did not call 911 or go to the hospital because she did not really care if she died.  The next day, she saw her cardiologist and described her symptoms.  He told her she had experienced a heart attack.  She then underwent an EKG and a heart catheterization.  No major blockage was found.  (Tr. 69-73.)

- She suffers from two different types of chest pain. The first is related to her heart condition and is exacerbated by stress.  She experiences this type of chest pain a couple times per week and takes nitroglycerin for it.  Her other type of chest pain is related to her asthma.  She feels chest pain on a daily basis.  (Tr. 72-73.)

- Her ability to walk is limited due to bursitis in her right knee.  The pain varies.  Sometimes she is unable to bend her knee and can only walk to the mailbox and back, a total of ten steps.  Other times, she is able to walk for thirty minutes, with breaks.  She tried medication for her knee but her doctor advised her to stop using it because of her history of bleeding ulcers.  She now uses an over the counter cream, and elevates her legs to relieve the swelling. She also experiences back and joint pain.  She had an MRI and x-rays of her knees.  She was told there was

"nothing major wrong." She has never been referred to a rheumatologist or orthopedic surgeon. (Tr. 77-82, 96.)

• She suffers from irritable bowel syndrome and has bouts of diarrhea. Her stomach problems began when she was a teenager. The frequency of her diarrhea varies. At one point, she had a colonoscopy and was told that "everything is fine." Prior to her colonoscopy, she experienced an episode every week and would have constant diarrhea for two to three days. She has not had a diarrhea episode for two months. When she does have one, she "lives in the bathroom" and cannot leave her house. (Tr. 82-85.)

• She was born with a blood deficiency and has a very weak immune system. She gets sick "real easy, real quick, real fast." When she was hospitalized in November 2007, the doctors thought she might have lupus. She was recently told that a blood test revealed she did not have lupus. She has not seen an immunologist since 2007. (Tr. 85-86.)

• She experiences vertigo on a daily basis. She feels nauseous and dizzy and cannot walk. When she has a bad vertigo episode, she has to sit still and close her eyes. This happens several times a day for a couple hours. She has not seen an ear, nose and throat specialist since 2007. (Tr. 87-89.)

• She experiences migraines once per week. They can last three to four days, and cause pain, nausea, and vomiting. She has suffered from migraines "on and off" since she was a teenager. She was able to work as a property manager despite her migraines, but at that time she only got one migraine per month. Her migraines have gotten worse since her husband died. Some of her migraines are "optical migraines." When she experiences this type of migraine, she loses her ability to distinguish colors. She takes Imitrex for this condition. (Tr. 89-91, 109-111.)

• On a typical day, she cleans her house; takes care of her personal needs; reads; and, goes for a walk. She is able to dress and bathe herself. Her sister helps with the housework, but she tries to keep the house clean every day so there is nothing major for her sister to do. She does the laundry a couples times per month, which involves going down the stairs to the basement. It takes a lot of effort but she has been preparing some meals for herself. She tries to walk for 30 minutes every day. Sometimes she only walks for ten to twenty minutes. When she walks, she often needs to take a break. She goes grocery shopping when someone will take her to the store. (Tr. 60-63, 66, 97.)

• She reads recipe books, the Bible, and self-help books. She reads for one to two hours each day, but has difficulty concentrating after an hour and has to go back and re-read the same passages over again. (Tr. 61, 68.)

• She visits with her brother, sister, and a friend. She visits friends or family at their homes for a few hours once a week, every other week. A friend comes to visit her at her house at least once per week and makes her go out to a restaurant or a store. She goes to church at least three times per week and volunteers for church activities once every three months. She occasionally plays cards but has trouble concentrating. She has no hobbies or interests. She has to force herself to go out and socialize. She only sleeps two to three hours per night. (Tr. 63-67, 94-95.)

• She cannot work because of her inability to concentrate and lack of stamina. Lifting is also a problem due to her chest, arm, and shoulder pain. (Tr. 93, 97.)

The VE testified Campbell had past relevant work as a property manager (highly skilled, SVP 8, performed as medium).  (Tr. 99.)  The ALJ then posed the following hypothetical:

> I'd like to ask you some hypothetical questions and each of them please assume an individual who was born on June 23, 1959.  Is a high school graduate and who has the previous work experience to which you just testified.  And hypothetical number one please assume that she can lift and/or carry 20 pounds occasionally and 10 pounds frequently.  She can stand and walk with normal breaks for about six hours in an eight hour workday.  Actually, I'm going to say for at least six hours in an eight hour workday.  She can sit with normal breaks for at least six hours in an eight hour workday.  She has no limitations in her ability to push and or pull including the operation of hand and/or foot controls other than is limited by her restrictions on lifting and/or carrying.  She can occasionally climb ramps and stairs.  She can never climb ladders, ropes, or scaffolds.  She can frequently balance and stoop.  She can occasionally kneel, crouch, and crawl.  She needs to avoid concentrated exposure to respiratory irritants such as fumes, [INAUDIBLE] dust, gases, poor ventilation, etcetera.  She should avoid all exposure to hazards such as dangerous moving machinery and unprotected heights.  She cannot operate a motor vehicle.  She is limited to simple, routine, repetitive tasks involving only simple work-related decisions and in general relatively few workplace changes.  She cannot interact with others in situations requiring substantial negotiations, persuasion, or conflict resolution.  She cannot work in an environment with high quotas, strict time limits or deadlines or fast-paced production demands such as those encountered in piecework or on a fast working moving assembly line.

(Tr. 99-101.)  The VE testified such an individual would not be able to perform Campbell's past relevant work, but would be able to perform the following jobs: (1) cashier II (unskilled, SVP 2, light); (2) fast food worker (unskilled, SVP 2, light); and, (3) sales attendant (unskilled, SVP 2, light).  (Tr. 101-102.)

The ALJ then asked a second hypothetical that was the same as the first "except that instead of being able to frequently balance and stoop she can only occasionally balance and stoop."  (Tr. 102.)  The VE testified that this change would not have any effect on the three previously identified jobs.  *Id.*

The ALJ then asked a third hypothetical that was the same as the second "with the additional restriction that she is limited to occasional interaction with supervisors and she is limited to occasional and superficial interaction with coworkers and the general public."  (Tr. 102-103.)  The VE testified such an individual could not perform the three previously identified jobs, but could perform the following jobs: (1) housekeeper cleaner (unskilled, SVP 2, light); (2) inspector hand packager (unskilled, SVP 2, light); and, (3) small parts assembler (unskilled, SVP

13

2, light).  (Tr. 103-104.)

The ALJ then asked "what is the effect of an individual being off task 20 percent of the workday." (Tr. 104.)  The VE responded there would be no jobs for such an individual.  *Id.* The ALJ then asked about the effect of an individual missing three days of work per month.  (Tr. 105.)  The VE again responded there would be no jobs for such an individual.  *Id.*

Campbell's attorney asked "what is the effect if any of the hypotheticals included the additional fact of missing more than one day of work per month."  *Id.*  The VE explained there would be no jobs for such an individual.  *Id.*  Campbell's attorney asked whether the addition of a sit/stand option at will "would reduce any of the hypotheticals to sedentary" work.  *Id.*  The VE responded that a sit/stand option at will would reduce the previously identified jobs to "sedentary numbers."  *Id.*

Finally, Campbell's attorney asked the following:

> If any of the hypothetical questions included the additional hypothetical fact of
> an off task break every hour for 5 to 10 minutes, and I don't know if that adds
> up to 20 percent or not, but with that– would a claimant with that additional
> limitation be able to successfully perform any of the jobs you indicated?

(Tr. 109.)  The VE responded such an individual would not be able to perform any of the previously identified jobs.  *Id.*

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[8]

_____

[8] The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe impairment."  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Campbell was insured on her alleged disability onset date, November 20, 2007, and remained insured through the date of the ALJ's decision, October 12, 2012.  (Tr. 23.)  Therefore, in order to be entitled to POD and DIB, Campbell must establish a continuous twelve month period of disability commencing between those dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

## IV.  Summary of Commissioner's Decision

The ALJ found Campbell established medically determinable, severe impairments, due to morbid obesity; tricompartmental osteoarthritis of the right knee, per X-rays in May 2012; precordial chest pain; restless leg syndrome; insomnia with history of excessive caffeine consumption; headaches; hypertension; asthma; chronic maxillary sinusitis; status postrepair of large incarcerated umbilical hernia with mesh on January 28, 2008; major depressive disorder; and, generalized anxiety disorder; however, her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 25- 27.)  Campbell was found incapable of performing her past work activities, but was determined to have a Residual Functional Capacity ("RFC") for a limited range of light work.  (Tr. 27- 36.)  The ALJ

---

experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Campbell was not disabled.  (Tr. 37-38.)

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs*., 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.  *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld

where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  Analysis

### Credibility

Campbell argues the ALJ improperly evaluated her credibility.  (Doc. No. 12 at 7-13.) She disputes the accuracy of some credibility findings, particularly those regarding the nature and extent of her activities of daily living.  Campbell asserts that "[o]verall, the ALJ provided inaccurate, misconstrued, or poor reasons for finding Plaintiff not credible" and "failed to logically connect how her activities of daily living detract from her credibility or the severity of her impairments."  *Id*. at 12-13.

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability.  *See Kirk v. Sec' of Health and Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).  When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment.  Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms."  SSR 96-7p.  Essentially, the same test applies where the alleged symptom is pain, as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition, and (2) whether the objective medical evidence

confirms the alleged severity of pain or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *See Felisky v. Bowen,* 35 F.3d 1027, 1038-39 (6th Cir. 1994).

If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record. *Id.* Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight." SSR 96-7p, Purpose section; *see also Felisky,* 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* SSR 96–7p, Purpose. Beyond medical evidence, there are seven factors that the ALJ should consider.[9] The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence. *See Cross,* 373 F.Supp.2d at 733; *Masch v. Barnhart*, 406 F.Supp.2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ found that, while Campbell's impairments could reasonably be expected to

---

[9]    The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* SSR 96–7p, Introduction.

18

cause her pain, Campbell's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with the RFC. (Tr. 29.) After recounting Campbell's hearing testimony, the ALJ thoroughly discussed the medical and opinion evidence regarding Campbell's physical and mental impairments. (Tr. 28-35.) The decision then evaluated Campbell's credibility as follows:

> The claimant's allegations are not fully supported by the medical evidence of record.
>
> With regard to the claimant's physical impairments, the claimant's most serious impairment is her morbid obesity. With regard to her knees, the record alludes to an X-ray report that showed tricompartmental osteoarthritis, however the actual imaging study does not appear in the record. Additionally, the claimant complained of chest pain and shortness of breath numerous times in the record. However, objective studies showed minor findings. Although the claimant stated that she was to undergo a heart catheterization, the evidence does not contain records of the procedure. The claimant has a long history of complaints regarding headaches and insomnia. However, the record shows that she made similar complaints while she worked at a skilled job. With regard to her mental impairments, while the record shows the claimant received mental health treatment, mental status examinations were mild with regard to symptoms and findings during mental status examinations. Additionally, the claimant testified that she saw a psychiatrist only once, and otherwise was treated by nurses or clinical counselors. Indeed, the claimant testified at the hearing that she had not seen any specialists in rheumatology, orthopedic surgery, otolaryngology, or neurology. She testified that she has not undergone surgeries or hospitalizations other than her hospitalizations in November 2007 for sepsis.
>
> The claimant's activities of daily living are also inconsistent with her alleged symptoms. The claimant testified during the hearing that she was able to clean her home and take care of her personal care. She said that she was able to dust, mop, vacuum, and do laundry. She stated that she walked for thirty minutes most days. She stated that she could cook and prepare her own meals. She stated that she could visit with others, including her sister, brother, and friends. She stated that she had a visitor once a week. She reported that she eats in restaurants once a week, attends movies, and attends church there times each month. She stated that she tried to volunteer at church serving food. These activities of daily living are inconsistent with the claimant's allegations regarding the severity of her impairments.
>
> The claimant made inconsistent statements in treatment and during the appeals process. For instance, on October 15, 2010, the claimant stated that she was let go during a reorganization of her last employer, and then she became ill (Exhibit 4F/2). However, on May 11, 2011, she stated that she lost her employment due to her medical problems (Exhibit 15F/15). On June 23, 2011, the claimant stated that she quit because she did not like her new boss (Exhibit 8F/2). I also note that in response to my open ended questions as to why she was unable to work, she did not mention vertigo and migraines. However, when questioned by her attorney, she stated that these conditions caused her significant limitations on a weekly basis. While not dispositive, these inconsistencies call into question the reliability of her other statements regarding the nature of her symptoms.

> The claimant was noncompliant with treatment and engaged in behaviors that may have exacerbated her symptoms.  Most notable in the record was the claimant's continued use of caffeine products.  For instance, on January 19, 2012, Dr. Graef noted that the claimant drank two to eight cups of coffee each day (Exhibit 13F/9-10).  Despite her complaints of insomnia, diagnostic polysomnograms were unremarkable (Exhibit 11F/2).  Additionally, the claimant was noted to be noncompliant with medication treatment on occasion.  (Exhibit 2F/4).

(Tr. 35-36.)

The Court finds the ALJ did not improperly assess Campbell's credibility.  The decision thoroughly considered both the medical and opinion evidence regarding Campbell's physical and mental impairments.  (Tr. 28-35.)  As set forth above, the ALJ provided a number of specific reasons for finding Campbell to be less than fully credible, including the lack of objective medical evidence to support Campbell's claims regarding the severity of her impairments; the nature and degree of her daily activities; her ability to sustain employment despite her migraines and insomnia; and, the fact that Campbell made inconsistent statements regarding her employment history and engaged in behaviors that may have exacerbated her symptoms.  (Tr. 35-36.)

With regard to the medical evidence, the ALJ set forth several specific instances where the medical record failed to support Campbell's claims of disabling impairments.  The ALJ noted, for example, that (1) although Campbell complained of chest pain and shortness of breath, the objective studies in the record showed minor findings with regard to these conditions; (2) there was no evidence in the record that Campbell underwent a cardiac catheterization; (3) Campbell's mental status examinations were mild and she was treated primarily by nurses or clinical counselors; (4) Campbell had not seen any specialists in rheumatology, orthopedic surgery, otolaryngology, or neurology; and, (5) Campbell had not undergone any surgeries or hospitalizations since her November 2007 hospitalization for sepsis.  Campbell does not contest the accuracy of any of these statements.  Rather, she simply asserts they are not relevant to credibility and, instead, reflect "availability of insurance [and] the preference of her doctors." (Doc. No. 12 at 9.)

The Court rejects this argument.  The regulations specifically provide that, among other

20

things, an ALJ should consider the objective medical evidence regarding a claimant's impairments, as well as evidence regarding his/her treatment history, in evaluating a claimant's credibility.  *See* 40 C.F.R. § 404.1529(c)(2) ("Objective medical evidence . . . is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms . . may have on your ability to work").  An ALJ may also consider the degree to which a claimant's statements are consistent with the medical evidence of record.  *See* SSR 96-7p, 1996 WL 374186 at * 5 (July 2, 1996) ("The adjudicator must consider such factors as: The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment.").  Campbell cites no authority for the proposition that the ALJ erred in basing his credibility determination, in part, on the above findings regarding the medical evidence.  Moreover, while Campbell argues that some of these findings may reflect "availability of insurance," she does not direct this Court's attention to anything in the record indicating that she failed to pursue specific procedures or treatment for financial reasons.  Accordingly, the Court finds the ALJ did not err in considering, as one factor in the credibility evaluation, the lack of objective medical evidence to support Campbell's claims regarding the severity of her impairments.

Campbell also argues the ALJ misrepresented the true extent of her daily activities.  She insists the ALJ erred because "[t]he ability to do minimal chores, walking short periods of time, visiting with family and friends, going out to eat every week, or rarely volunteering fails to translate to SGA level work."  (Doc. No. 12 at 12.)  As an initial matter, the Court finds the ALJ did not mischaracterize Campbell's statements regarding her daily activities.  Consistent with the ALJ's findings, Campbell testified during the hearing that she takes care of her personal needs; does some cleaning each day; does laundry a couple times per month; and, prepares some meals for herself.  (Tr. 60-63, 66, 97.)  She also stated she tries to walk for 30 minutes each day with

breaks, although some days she can only walk for ten to twenty minutes.[10]  *Id.*  Moreover, as the
ALJ correctly noted, Campbell testified that she visits with family and friends at least once a
week;[11] eats in restaurants once a week; goes to church three times per month; and volunteers for
church activities once every three months.  (Tr. 63-67, 94-95.)  While Campbell complains this
level of activity is inconsistent with the ability to work full-time, the Court finds the ALJ did not
err in considering Campbell's daily activities as one factor in his credibility determination.  *See,
e.g., Pasco v. Comm'r of Social Security*, 137 Fed. Appx. 828, 846 (6th Cir. 2005) (substantial
evidence supported finding that plaintiff was not disabled where plaintiff could "engage in daily
activities such as housekeeping, doing laundry, and maintaining a neat, attractive appearance"
and could "engage in reading and playing cards on a regular basis, both of which require some
concentration") (footnote omitted); *Heston v. Comm'r of Social Security*, 245 F.3d 528, 536 (6th
Cir. 2001) (ALJ may consider claimant's testimony of limitations in light of other evidence of
claimant's ability to perform tasks such as walking, going to church, going on vacation, cooking,
vacuuming, and making beds); *Bogle v. Sullivan*, 998 F.2d 342, 348 (6th Cir. 1993) (a claimant's
ability to perform household and social activities on a daily basis is contrary to a finding of
disability); *Gist v. Secretary of Health and Human Services*, 736 F.2d 352, 358 (6th Cir.1984) (a
claimant's capacity to perform daily activities on a regular basis will militate against a finding of
disability).

Moreover, the Court notes that the ALJ's credibility determination was not based solely
on Campbell's ability to engage in daily activities.  As set forth above, the decision also
considered the lack of objective medical evidence and Campbell's treatment history.  In addition,
the ALJ noted Campbell's ability to work despite her "long history of headaches and insomnia,"

---

[10]  This testimony is generally consistent with the ALJ's findings that Campbell walks for
30 minutes "most days."  (Tr. 35.)

[11]Campbell argues that "visiting family and friends has no basis to detract from the
severity of her conditions, as a quadriplegic can visit with friends."  (Doc. No. 12 at 11.)
However, Campbell's ability to engage in social interaction is relevant to the ALJ's
consideration of her credibility with respect to her mental impairments.

and noted in particular the fact that "in response to my open ended questions as to why she was unable to work, she did not mention . . . migraines." (Tr. 35.) Finally, the ALJ relied in part on inconsistencies in Campbell's statements about her reasons for leaving her employment and the fact that her excessive caffeine use may have exacerbated her sleep problems. *Id.*

In sum, the ALJ considered a wide variety of factors in assessing Campbell's credibility. These factors are supported by evidence in the record and are sufficiently specific to make the basis of the ALJ's credibility analysis clear. Campbell urges the Court to find that the reasons given by the ALJ do not demonstrate a lack of credibility. However, it is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)). *See also Vance v. Comm'r of Soc. Sec.*, 2008 WL 162942 at * 6 (6th Cir. Jan. 15, 2008) (stating that "it squarely is *not* the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.") The ALJ provided sufficient reasons for his credibility determination and supported those reasons with reference to specific evidence in the record.

Accordingly, the Court finds Campbell's first assignment of error to be without merit.

### RFC Determination

Campbell next argues the ALJ's RFC assessment is not supported by substantial evidence because it failed to include appropriate limitations related to her optic migraines. (Doc. No. 12 at 13-14.) Specifically, she argues that, despite acknowledging her headaches as a severe impairment, "[t]he ALJ failed to provide limitations regarding the environment she could work in, and the ALJ failed to afford any limitation regarding being off task or missing work due to headaches." *Id*. at 13.

The Commissioner argues the RFC is supported by substantial evidence. She maintains the ALJ properly accounted for Campbell's headaches by specifying that Campbell should never drive and should avoid concentrated exposure to fumes, odors, gases, dusts, and poor ventilation. The Commissioner also emphasizes that the RFC limits Campbell to simple, routine repetitive

23

tasks involving only simple work-related decision and relatively few workplace changes; and, states she cannot interact with others in situations requiring substantial negotiation, persuasion, or conflict resolution, or work in an environment with high production quotas or strict time limits.  Finally, the Commissioner maintains that Campbell has failed to show that additional restrictions regarding her headaches were supported by the medical evidence and not accommodated by the RFC.

A claimant's RFC is the most that she can still do despite her functional limitations.  20 C.F.R. § 404.154(a); SSR 96-8p.  The assessment must be based upon all of the relevant evidence, including the medical records and medical source opinions.  20 C.F.R. § 404.1546(c).  The final responsibility for deciding the RFC "is reserved to the Commissioner."  20 C.F.R. § 404.1527(e)(2).  As noted supra, while this Court reviews the entire administrative record, it "does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ."  *Reynolds,* 2011 WL 1228165 at * 2.  Indeed, the Sixth Circuit has repeatedly upheld ALJ decisions where medical opinion testimony was rejected and the RFC was determined based upon objective medical and non-medical evidence.  *See e.g., Ford v. Comm'r of Soc. Sec.*, 2004 WL 2567650 (6th Cir. Nov. 10, 2004); *Poe v. Comm'r of Soc. Sec.*, 2009 WL 2514058 (6th Cir. Aug. 18, 2009).  "[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe,* 2009 WL 2514058 at * 7.

Here, the ALJ determined, at step two, that Campbell suffered from a number of severe impairments, including headaches.  (Tr. 25.)  In the course of discussing the medical evidence regarding Cambell's physical and mental impairments, the decision specifically acknowledged her complaints of migraine headaches.  (Tr. 29, 30.)  The ALJ then evaluated the opinion evidence, which included six opinions regarding Campbell's physical limitations and four opinions regarding her mental limitations.[12]  (Tr. 33-35.)  The RFC was formulated as follows:

---

[12]The ALJ discussed the following opinions regarding Campbell's physical limitations consisted: (1) a treatment note of Dr. Kline dated November 20, 2007; (2) Dr. Paras' December 2010 opinion; (3) Dr. Gahman's January 2011 opinion; (4) Dr. Albert's May 2011 opinion; (5)

After careful consideration of the entire record, I find that the clamant has the residual functional capacity to perform a limited range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). She can lift and/or carry twenty pounds occasionally and ten pounds frequently. She can stand and/or walk (with normal breaks) for at least six hours in an eight-hour workday. She can sit (with normal breaks) for at least six hours in an eight-hour workday. She has no limitations in her ability to push and/or pull (including the operation of hand and/or foot controls), other than as limited by her restrictions on lifting and/or carrying. She can occasionally climb ramps and stairs. She can never climb ladders, ropes or scaffolds. She can frequently balance and stoop. She can occasionally kneel, crouch and crawl. She needs to avoid concentrated exposure to respiratory irritants such as fumes, odors, dusts, gases, poor ventilation, etc. She should avoid all exposure to hazards such as dangerous moving machinery and unprotected heights. She cannot operate a motor vehicle. She is limited to simple, routine repetitive, tasks involving only simple, work-related decisions, and in general, relatively few workplace changes. She cannot interact with others in situations requiring substantial negotiation, persuasion, or conflict resolution. She cannot work in an environment with high quotas, strict time limits or deadlines, or face [sic]- paced production demands (such as those encountered in piecework or on a fast moving assembly line).

(Tr. 27-28.)

The Court rejects Campbell's argument that the above RFC fails to adequately account for her migraine headaches. The RFC provides that Campbell cannot drive a motor vehicle and should avoid concentrated exposure to fumes, odors, dusts, gases, etc. Although Campbell argues these limitations relate to her insomnia and asthma and are not relevant to her headaches, the Court notes Campbell reported she never obtained a driver's license because of her optical migraines. (Tr. 398.) She also indicated to Dr. Paras that her migraines were affected by "certain smells like raspberry." (Tr. 402.) Thus, while these limitations may also relate to several of Campbell's other severe impairments, there is substantial evidence in the record to conclude that they are likewise relevant to her migraines.

Campbell nonetheless argues that "[i]t is common sense that migraine headaches cause individuals to be either off-task or miss work" and complains that "[n]either of these were addressed in the RFC, despite the condition being found as severe." (Doc. No. 16 at 2.)

---

Dr. Graef's January 2012 treatment note indicating that Campbell should be extremely careful with activities such as driving or operating machinery; and, (6) Dr. Chaffee's May 2011 opinion. With regard to Campbell's mental limitations, the ALJ discussed the following opinions: (1) Dr. Rindsberg's October 2010 opinion; (2) Dr. Meyer's November 2010 opinion; (3) Dr. Sipps' June 2011 opinion; and, (4) Dr. Semmelman's July 2011 opinion.

25

Campbell does not, however, direct this Court's attention to any physician opinion evidence that supports this particular functional limitation.  While Dr. Kline diagnoses migraines in his June 2010 opinion and states Campbell suffers from "daily headaches," he does not opine she would be off-task for any specific amount of time or that she would miss work.[13]  (Tr. 395-396.) Indeed, Dr. Kline does not offer any specific work-related limitations, either in his June 2010 opinion or his April 2011 opinion.  (Tr. 395-396, 411-412.)  Moreover, although Dr. Paras found that Campbell's "ability to perform work-related physical and mental activities is mainly limited by her migraine headaches," he nevertheless concluded she was capable of light work.  (Tr. 404.) As noted *supra*, both state agency physicians Dr. Gahman and Dr. Albert similarly concluded that Campbell was limited to a reduced range of light work consistent with the RFC.  (Tr. 133-135; 164-166.)

In light of the above, the Court finds the RFC reasonably accounts for Campbell's migraines and is supported by substantial evidence.  Accordingly, Campbell's second assignment of error is without merit.

## VII.  Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence.  Accordingly, the decision should be AFFIRMED.

s/ Greg White
United States Magistrate Judge

Date: January 28, 2015

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right**

---

[13]The Court notes that the decision cites to a treatment note from Dr. Kline dated November 20, 2007, in which he instructs Campbell to "resume prehospital activities including bathing, driving, lifting, walking, stair climbing, and sexual activity" upon discharge from her hospitalization for acute sinusitis.  (Tr. 353-354.)  To the extent the ALJ considered this note to be Dr. Kline's opinion, it also does not set forth any particular functional limitations, much less any indicating Campbell would be off-task or miss work for any specific period of time.

26

to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).